**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Oct 29 2013, 5:24 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**STEVEN KNECHT**
Vonderheide & Knecht, P.C.
Lafayette, Indiana

ATTORNEYS FOR APPELLEE:

**RICHARD D. MARTIN**
**KYLE D. GOBEL**
Frankfort, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| REBECCA WAGGONER, | ) | |
| | ) | |
| Appellant-Respondent, | ) | |
| | ) | |
| vs. | ) | No. 12A02-1303-DR-231 |
| | ) | |
| ROBERT WAGGONER, | ) | |
| | ) | |
| Appellee-Petitioner. | ) | |

APPEAL FROM THE CLINTON SUPERIOR COURT
The Honorable Justin H. Hunter, Judge
Cause No. 12D01-0708-DR-391

**October 29, 2013**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**ROBB, Chief Judge**

## Case Summary and Issues

Rebecca Waggoner ("Mother") appeals the trial court's denial of her Motion to Modify Custody. Mother presents one issue on appeal: whether the trial court abused its discretion in denying her motion. Appellee Robert Waggoner ("Father") raises two additional issues in reply: 1) whether the trial court's split of guardian ad litem ("GAL") fees was appropriate; and 2) whether appellate attorney's fees should be assessed against Mother. Concluding that the trial court did not abuse its discretion in denying Mother's motion, that the split of GAL fees is not prohibited, and that Mother should not pay appellate attorney's fees, we affirm.

## Facts and Procedural History

The evidence most favorable to the trial court's judgment reveals that Mother and Father were married in 2000 and have two children: D.W., born in 2001, and J.W., born in 2005 (collectively, the "Children"). Mother and Father were divorced in 2007, and at the time, both parties lived in Clinton County. Initially, Mother had custody of both Children and Father exercised parenting time. In 2009, the parties filed an Agreed Order, agreeing to share legal custody of the Children and divide parenting time equally, with the Children staying with each parent on alternating weeks. Also in 2009, Mother married Father's cousin, Ronald Waggoner, and moved to a different house within Clinton County. That same year, Mother and Ronald had a child, T.W.

Both Children attended pre-school in Clinton County, and D.W. attended Frankfort Covenant Academy through the third grade. In the fall of 2009, Mother and Father

2

considered not sending D.W. to Frankfort Covenant Academy, although they ultimately sent him that year. However, Mother and Father then decided that D.W. would not attend Frankfort Covenant Academy after the third grade, and that J.W. would not attend that school at all. In the fall of 2010, Mother and Father began discussing schooling options. Father wanted to find a good public school that offered options in sports, science, and classroom participation; Mother believed that there were no good public schools because none of the public schools meshed with her Christian beliefs. By the end of that school year, in the spring of 2011, Mother and Father had still not come to an agreement on schooling. Mother suggested two schools in Lafayette, one of which Father believed was cost-prohibitive, and the other of which admitted students via a lottery system with no guarantee of placement.

Realizing that some commuting was going to be necessary to find a school that both parents could agree on, Father began looking at schools outside of Clinton County. Father researched the Zionsville School System and found that it had received good grades from the Indiana Department of Education. In April or May of 2011, Father notified Mother that he was planning to move to Zionsville and that it had an excellent school system. Mother was not sold on the public school, and Mother and Father continued discussions into the summer. Father did not file with the trial court a notice of intent to move, although he notified Mother of his intent and discussed with her ways that he might help to alleviate the additional burden that the increased distance would put on her. He also suggested that they could go to court to resolve their differences. Mother did not want to go to court at that point as she wanted to keep things simple and try to work things out between the two of them.

3

In July of 2011, Father moved to Zionsville, and that same month he remarried. Father testified that the better school system was the primary reason that he moved, and the fact that Zionsville was closer to his new wife's workplace was only a side benefit. At some point that summer, Mother agreed to send the Children to school in Zionsville. Although it does not seem that the parents discussed it, in Mother's mind they were giving the new school a trial period, whereas Father believed that the change would likely be permanent. Mother suggested that they adjust the parenting time from a one-week alternating schedule to a two-week alternating schedule. This was not filed with the court, but the parties began this new schedule in July of 2011 in order to get in one complete cycle before school began.

For the first part of the school year, when Mother had the Children, she would meet Father in Lebanon at 7:00 a.m. and transfer the Children to him, and he would get them to school. Not long into the school year, however, Mother decided to simply drive the Children to school herself during her two-week rotations, as this allowed the Children to sleep in later. Mother would drop D.W. off at school and then take J.W. to a McDonald's or Starbucks to wait until it was time to drop J.W. off at school, as J.W.'s school started one hour and twenty minutes later than D.W.'s. Mother then drove home to go to work. Regardless of which parent's rotation they were on, the Children would go to the Boys and Girls Club after school until the parent they were staying with picked them up. D.W. struggled both socially and academically when he first moved to Zionsville, but by the end of the year he was doing well academically and had made many friends. J.W. did well in her grade and also made friends, and it seems that both Children were well-adjusted and happy by the end of the school year.

4

In July of 2012, Mother filed a Motion to Modify Custody, requesting that she be granted primary physical custody of the Children and that Father be given parenting time. Mother also enrolled the Children in the Clinton Prairie School Corporation without notifying Father. Mother's main concern was the amount of time the Children were spending on the road, and that because they had to get up earlier in order to make it to school on time, they were not getting as much sleep. Mother felt that if the Children lived with her and went to Clinton Prairie, they would sleep later than they could when she drove them to Zionsville and would have a much shorter trip on the bus than they then had in the car.

In response, Father filed his own Motion to Modify Custody in August 2012, requesting that he be granted primary physical custody of the Children and that Mother be given parenting time. Father also filed an Emergency Motion for Temporary Restraining Order ("TRO") requesting that Mother be directed not to change the Children's school from Zionsville to Clinton Prairie, and that the Children begin classes at Zionsville when the school year began.

The TRO was granted, and the Children began school in Zionsville on August 15, 2012. A hearing was held on the TRO on August 22, 2012. The court also conducted an in camera interview with D.W. On August 29, 2012, the court extended the TRO pending a hearing on Mother's Motion to Modify Custody and appointed a GAL for the Children.

On November 19, 2012, the GAL filed a report, finding that both Mother and Father are good parents and both of the Children are well adjusted; both households are appropriate and the Children could thrive in either household; both households have good step-parents

who have developed strong relationships with the Children; the Children are accustomed to the joint physical arrangement and have benefited from it; the Children have extended family and friends in Frankfort; the Children had adjusted well to the Zionsville schools and are performing well; both parents have flexibility with their work schedules, although Mother has slightly more flexibility; and another change of schools may be difficult for the Children. The GAL concluded that it was an extremely close case; if at all possible the parents should continue to explore options for continuing a joint physical arrangement; and if a joint arrangement was not possible, he would narrowly recommend that primary physical custody be placed with Mother due to factors including the Children's history in Clinton County, Mother's job flexibility, and the fact that the Children have a sibling at Mother's house.

A hearing was held on Mother's Motion to Modify Custody on November 29 and December 4, 2012. Mother, Father, and the GAL all testified at the hearing, and the judge interviewed both of the Children in camera. On January 8, 2013, the trial court issued an order denying Mother's Motion to Modify Custody. The court determined that it was in the best interest of the Children to continue to spend nearly equal time with both Mother and Father and that the Children should continue to attend school in Zionsville. Because of the disproportionate burden of travel on Mother, the court ordered that she may elect up to eight school days during each bi-weekly parenting time when Father would provide for the transportation of the Children between Mother's house and the school, either at the beginning or the end of the day but not both; or that up to eight days during each bi-weekly period Mother may elect to meet Father in Lebanon both before and after school to exchange the

6

Children.  In the case of inclement weather, the court provided that Mother may choose to have the Children stay at Father's house and may make up that time.  The court also ordered that the GAL's final bill be divided in proportion to the time spent questioning the GAL at trial, such that Mother was to pay 28%, totaling $105, and Father was to pay 72%, totaling $270.  On January 22, 2013, the court issued a supplementary order setting child support and ordering Father to pay $92 per week in child support based on the disproportionate earnings of the parents.  This appeal followed.

## Discussion and Decision

### I.  Modification of Custody

#### A.  Standard of Review

The modification of custody lies within the sound discretion of the trial court.  Fields v. Fields, 749 N.E.2d 100, 107-08 (Ind. Ct. App. 2001), trans. denied.  Our review is limited to determining whether the trial court abused its discretion in applying the statutory guidelines.  Id.  We may neither reweigh the evidence nor judge the credibility of the witnesses.  Id.  Reversal is warranted only upon a showing of a manifest abuse of discretion, that is, when the trial court's decision is clearly against the logic and effect of the facts and circumstances.  Id.

#### B.  Custody of the Children

Mother argues that the trial court abused its discretion in not granting her primary custody of the Children due to Father's move to Zionsville.  Mother argues that it is in the

Children's best interest to live with her full-time as they would be able to sleep in later and spend less time on the road getting to and from school.

Indiana Code section 31-17-2-21 governs modification of child custody and provides, in pertinent part, that:

> (a) The court may not modify a child custody order unless:
>     (1) the modification is in the best interests of the child; and
>     (2) there is a substantial change in one (1) or more of the factors that the court may consider under section 8 . . . of this chapter.
> (b) In making its determination, the court shall consider the factors listed under section 8 of this chapter.

And the factors listed under Indiana Code section 31-17-2-8 are:

> (1) The age and sex of the child.
> (2) The wishes of the child's parent or parents.
> (3) The wishes of the child, with more consideration given to the child's wishes if the child is at least fourteen (14) years of age.
> (4) The interaction and interrelationship of the child with:
>     (A) the child's parent or parents;
>     (B) the child's sibling; and
>     (C) any other person who may significantly affect the child's best interests.
> (5) The child's adjustment to the child's:
>     (A) home;
>     (B) school; and
>     (C) community.
> (6) The mental and physical health of all individuals involved.
> (7) Evidence of a pattern of domestic or family violence by either parent.
> (8) Evidence that the child has been cared for by a de facto custodian, and if the evidence is sufficient, the court shall consider the factors described in section 8.5(b) of this chapter.

As with many matters involving children, the ultimate factor in determining whether to modify custody is the best interests of the children. The GAL systematically went through

each of the statutory factors in his report and determined that none of the factors favored either parent,[1] and testimony at the hearing supports that conclusion.

Mother also argues that Father's failure to file a notice of relocation under Indiana Code section 31-17-2.2-1 should be considered as a factor in determining custody here. Mother argues that, had Father filed the required notice, she would have been able to go to court before the Children enrolled in Zionsville and have custody determined before the Children became settled in their new schools. While Mother was still entitled to request a modification of custody at that point, we understand that Mother was pro se and may not have fully understood her rights. Nonetheless, the record indicates that Father informed Mother of his intent to move by May of 2011, and that he suggested going to court as one option as they tried to resolve their differences. Importantly, Mother testified that she chose not to go to court at that point because she "always think[s] it's best to work things out peaceably for the children without having to drag them into a custody battle," and she was "hoping and trying and wishing that [she and Father] could work something out without having to drag it this far because it has been so difficult on the children as [she] knew it would be." Transcript at 251-52. While Father should have filed notice of intent to relocate, it does not appear that it would have changed anything at that time.

In the end, the trial court decided that maintaining the status quo, while attempting to alleviate some of Mother's burden, was in the best interests of the Children. While the court's order might be different from what we would have ordered, there is evidence that the

---

[1] The GAL noted that factors six and seven were not raised as concerns by either parent and did not address factor eight, which was not at issue in this case.

Children do well in both homes and that neither home is better. The record also indicates that the Children have done well with the split parenting time and wish to continue spending approximately half of their time with each parent. We cannot say that the trial court's decision is clearly against the logic and effect of the facts and circumstances.

## II. Guardian ad Litem Fees

Father argues that the trial court should not have split GAL fees based on how long each party spent questioning the GAL at the hearing. Indiana Code section 31-17-6-9 allows the court to order "either or both parents" to pay a GAL fee and does not specify any factors in determining a split between both parents. We are not persuaded by Father's citation to law relating to attorney's fees rather than GAL fees. While the court's method here was unusual, we see no reason that it was prohibited. We also observe that, in its supplemental order, the court found that Father's income is higher than Mother's—economic resources of the parties being one factor that Father promotes in considering how to split GAL fees. We do note that there is nothing to indicate that cross-examination of the GAL was considered to be misconduct by the trial court or that the split of fees was intended as any kind of punishment.[2]

## III. Appellate Attorney's Fees

Finally, Father argues that we should assess appellate attorney's fees against Mother under Indiana Appellate Rule 66(E) due to substantive and procedural bad faith. Father argues that attorney's fees should be awarded because Mother's brief contains an "incorrect

---

[2] Father says that "cross-examination of the guardian ad litem cannot possibly be considered misconduct that resulted in additional litigation expenses for [Mother]. The guardian ad litem statute

10

standard of review," Mother "essentially asks this Court to reweigh the evidence" and "blatantly misrepresents the Guardian Ad Litem's recommendations," and her "failure to provide the Court with the facts most favorable to the trial court's determination . . . required [Father] to expend an inordinate amount of attorneys' fees in providing the Court with an appropriate Statement of the Facts." Appellee's Brief at 29-30.

We do not find any errors in Mother's brief to be nearly as egregious as Father claims or to warrant imposition of attorney's fees. Nor do we see how Father's attorney was required to spend an inordinate amount of time in providing his own statement of the facts. While our appellate rules allow an appellee to omit the statement of the facts if they agree with the appellant's statement of the facts, see Indiana Appellate Rule 46(B), in our experience most appellees choose to write their own statement of the facts, and nothing in Father's statement of the facts suggests than an "inordinate" amount of time was spent in its preparation. We decline to assess attorney's fees in this case.

## Conclusion

Concluding that the trial court did not abuse its discretion in denying Mother's Motion to Modify Custody, that the split of the GAL fees was permissible, and that Mother should not be ordered to pay appellate attorney's fees, we affirm.

Affirmed.

RILEY, J., and KIRSCH, J., concur.

---

expressly allows for cross-examination of the guardian ad litem by either party." Appellee's Brief at 27.